UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANGELA CROCKETT,

      Plaintiff,

v.                                                     Civil Case No. 20-13107
                                                   Honorable Linda V. Parker

GENERAL MOTORS LLC,

      Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

After her employment with Defendant General Motors LLC ("GM) was terminated in February 2019, Plaintiff Angela Crockett filed this lawsuit claiming that she was denied overtime wages in violation of the Fair Labor Standards Act ("FLSA").  GM filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, contending that Plaintiff was properly classified as exempt from the FLSA's overtime requirement.  (ECF No. 87.)  The motion has been fully briefed.  (ECF Nos. 29, 31.)  Finding the facts and legal arguments sufficiently presented in the parties' briefs, the Court is dispensing with oral argument with respect to GM's motion pursuant to Eastern District of Michigan Local Rule 7.1(f).

## I. Standard of Review

Summary judgment pursuant to Rule 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Id*. at 323. Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252. The court must accept as true the

non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

"A party asserting that a fact cannot be or is genuinely disputed" must designate specifically the materials in the record supporting the assertion, "including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1).

## II. Factual Background

Plaintiff received a Bachelor of Science in Mechanical Engineering in 1990. (Pl. Dep. at 39, ECF No. 27-4 at Pg ID 241.) As part of her coursework, Plaintiff took classes in multiple engineering disciplines, including one or two courses in electrical engineering. (*Id.*; *see also* Pl. Decl. ¶ 4, ECF no. 29-1 at Pg ID 998.) Plaintiff also earned a Master's Degree in Business Administration in 2008. (Pl. Dep. at 39, ECF No. 27-4 at Pg ID 241)

GM is a multi-national automobile manufacturer headquartered in Detroit, Michigan. (Murray Aff. ¶ 2, ECF No. 27-2 at Pg ID 117-18.) Engineers and designers work at GM's "Warren Tech Center" in Warren, Michigan, where they focus on automotive engineering, design, and advanced technology. (*Id.*) In 2018, GM hired Plaintiff for a three-month internship as part of its "Take 2" program, which allows individuals to rejoin the workforce following a career break. (Pl.

Dep. at 61-62, ECF No. 27-4 at Pg ID 263-64.) Plaintiff was placed in the Power and Signal Distribution Systems ("PSDS") group doing electrical components at the Warren Tech Center. (*Id.*; *see also* Murray Aff. ¶ 3, ECF No. 27-2 at Pg ID 118.)

Lynn Murray was the engineering group manager for the PSDS group. (Murray Aff. ¶ 1, ECF No. 27-2 at Pg ID 117.) The group included Murray, several lead engineers, and a number of design release engineers ("DREs"). (*Id.* ¶ 5, Pg ID 118.) DREs were required to have an engineering degree. (*Id.* ¶ 7, Pg ID 119.)

The PSDS group was responsible for working with electrical wiring "harnesses" in assigned GM trucks. (*Id.* ¶¶ 1, 3, Pg ID 117-18.) A wiring harness is a cable or wiring assembly containing an integrated arrangement of cables or wires within an insulated material. (*Id.* ¶ 4, Pg ID 118.) An electrical wiring harness transmits signal or electrical power to different areas of a vehicle, such as the doors, instrument panels, and the frame/chassis. (*Id.*) The primary purpose of the PSDS group was to support GM's manufacturing process by performing electrical design work and solving electrical engineering problems identified at various stages of a vehicle's development cycle, such as issues identified during pilots and tryouts, manufacturing, or in the context of warranty claims. (*Id.* ¶ 6, Pg ID 119.)

After issues are identified, they are entered into GM's "Problem Resolution Tracking System" ("PRTS"). (*Id*. ¶ 7, Pg ID 119.) Employees within the PSDS group then analyze and solve the problems using their education, experience, judgment, and discretion. (*Id*.) There are no written procedures or guidelines for addressing the issues but rather, as "professionals," the DREs are expected to be able to "best ascertain next steps to take." (Murray Dep. at 12, ECF No. 27-3 at Pg ID 135; *see also* Pl. Dep. at 100-01, 135-36, ECF No. 27-4 at Pg ID 302-03, 338-39.)

GM hired Plaintiff to join the PSDS group as a full-time DRE upon the completion of her internship. (Pl. Dep. at 69-70, ECF No. 27-4 at Pg ID 271-72.) In this position, Plaintiff earned a salary of $90,000 ($7,500 per month). (*Id*. at 75-76, Pg ID 277-78.) Plaintiff received this salary regardless of the number of hours she worked. (*Id*. at 76, Pg ID 278.)

A few weeks after she was hired into the DRE role, Plaintiff was assigned electrical wiring harnesses in the doors of GM's light and heavy-duty pickup trucks. (*Id.* at 83-84, Pg ID 285-86.) Plaintiff was the DRE responsible for this part; DREs in the group were assigned different parts of the trucks. (*Id*. at 99, 239, Pg ID 301, 441.) If a problem or issue was entered into the PRTS that involved a door harness, Plaintiff communicated with the supplier or plant to obtain more

5

detailed information and then she began "working to 'root cause' and create a solution to the problem." (Pl. Decl. ¶ 9, ECF No. 29-1 at Pg ID 999.)

Once a proposed solution was identified, Plaintiff wrote an Engineering Work Order ("EWO") or a Temporary Work Order ("TWO"), depending on the situation. (*Id.*) If the solution required a new part, a mock-up would be created to test the solution. (*Id.*) As Plaintiff testified, "you don't just make a change to a part; you have to look at the data and see what the data says and the environment, so, you know, that –to come up with a resolution, then carry it through to the actual environment." (Pl. Dep. at 112, ECF No. 27-4 at Pg ID 314.)

After a solution was approved, Plaintiff was responsible for writing an Engineering Change Request ("ECR") to incorporate any change to the part. (*Id.*) Plaintiff testified that she "was expected to learn how to engineer the wiring harnesses independently of getting any type of direction from management or mentors." (Pl. Dep. at 100-01, ECF No. 27-4 at Pg ID 302-03; *see also* Murray Aff. ¶ 10, ECF No. 27-2 at Pg ID 120 (explaining that "the nature of the DRE role required [Plaintiff] to take ownership of her assigned wiring harnesses and work without direct oversight").) Plaintiff's "lead" and then Murray had to approve the work orders Plaintiff completed. (Pl. Decl. ¶ 14, ECF No. 29-1 at Pg ID 1001.)

In a declaration submitted in response to GM's motion, Plaintiff provides four examples of problems assigned to her during her tenure as a DRE, which she

6

resolved. (*See generally*, Pl. Decl., ECF No. 29-1.) One issue involved a wiring harness that was bowing toward the window and could potentially interfere when the window was rolled into the door. (*Id.* ¶ 10, Pg ID 1000.) Plaintiff resolved the issue by adding a conduit (i.e., a plastic sleeve) to the harness, which held the wires more securely in place. (*Id.*) She maintains that solving this problem did not require an engineering degree. (*Id.*)

Another issue involved a driver-side window control switch that did not work. (*Id.* ¶ 11, Pg ID 1000.) Plaintiff "eventually" traced the problem to a broken ground wire and a door harness that was pinched in several places. (*Id.*) The door harness was replaced and the ground wire was repaired. (*Id.*) Plaintiff also encountered a mirror camera that did not function because the COAX cable in the door wiring harness had shorted out. (*Id.* ¶ 12.) The camera, cable, and wiring harness were replaced. (*Id.*)

The fourth example of a problem Plaintiff addressed was identifying a replacement for a discontinued part necessary to build the trucks to which Plaintiff was assigned. (*Id.* ¶ 13, at Pg ID 1001.) According to Plaintiff, this involved contacting the supplier to identify a replacement part, which then needed to be approved by an "architect" for GM, and then preparing the necessary work orders and a Visual Change Document reflecting the modification. (*Id.*) "Obtaining

information regarding a replacement part," Plaintiff maintains, "is not the type of work that requires an engineering degree." (*Id.*)

Nevertheless, during her deposition, Plaintiff testified that electrical wiring harnesses are "known inside and outside the industry as the most complicated product that one could work on," and are "the most dynamic and complicated commodity within General Motors." (Pl. Dep. at 104-05, 186, ECF No. 27-4 at Pg ID 306-07, 388.) Plaintiff further testified that she was qualified for the DRE position based on her fifteen years of engineering experience, her automotive experience, and her engineering and master's degree. (*Id.* at 106, Pg ID 308.)

Plaintiff's assigned workplace was at the Warren Tech Center, although she also could do the majority of her work from home if she chose to. (*Id.* at 109-11, Pg ID 311-13.) She worked at a shared table on her GM-issued laptop. (*Id.* at 109-10, Pg ID 311-12.) Occasionally, although "[i]t wasn't regular," Plaintiff worked hands-on at a plant, with the supplier, or at the GM technical headquarters as part of the process of working on solutions to the problems assigned to her. (*Id.* at 108-09, Pg ID 310-11.)

GM identified deficiencies in Plaintiff's performance at her first mid-year "CAP" review. (2019 CAP Mid-Year at 6, ECF No. 27-11 at Pg ID 543.) As part of the review, Plaintiff completed a self-review where she marked herself as being "on track" with respect to various listed goals. (*Id.* at 1-3, Pg ID 538-40; Pl. Dep.

at 120-22, Pg ID 322-24.)  These goals included "[u]s[ing] known quality engineer solutions" and "[r]oot cause PRTS issue[s]." (*Id.* at 2, Pg ID 539.)  Her job responsibilities were identified as including "[e]nsur[ing] quality engineering on 7 door wiring harnesses for [light duty] and 44 door wiring harnesses on [heavy duty]" trucks.  (*Id.* at 3, Pg ID 540.)

In November 2019, Plaintiff was placed on a Plan for Improvement.  (Pl. Dep. at 204-05, ECF No. 27-4 at Pg ID 406-07; PFI, ECF No. 27-25.)  The PFI noted four areas of deficiency: (1) ECRs/PRTSs, (2) engineering solutions, (3) ownership of harness, and (4) planning workload.  (*Id.*)  According to Murray, the PFI was initiated based on her observations of Plaintiff's deficiencies and feedback Murray received from Plaintiff's "customers", which included: (1) scheduling meetings at plants and "rather than going to the plant and suggesting I understand the problem, here are my three alternate solutions . . . she would go . . . and say, what do you want me to do"; (2) providing contradictory and untimely technical direction to the supplier; (3) feedback from GM's pre-production ("PPO") facility that Plaintiff "was not providing them the information that they needed to build a vehicle"; and (4) failing to engage with buyers regarding negotiations over changes to work orders she was making.  (Murray Dep. at 26-31, ECF No. 27-3 at Pg ID 149-154.)

9

Plaintiff completed a 2019 CAP Year-End review, where she rated herself as "on track" or having "completed" the listed goals and results, which included "technical professional expertise," "solves problems analyses issues," "ensure on-time Door Wiring Harness releases, with quality," and "ensure quality engineering on 7 Door Wiring Harnesses for [light duty] and 44 Door Wiring Harnesses on [heavy duty]" trucks. (2019 CAP Year-End, ECF No. 27-30.) Plaintiff testified that these job duties were her responsibilities as a DRE. (Pl. Dep. at 244-45, ECF No. 27-4 at Pg ID 446-47.)

On February 3, 2020, GM terminated Plaintiff's employment.

### III. Applicable Law and Analysis

The FLSA requires employers to generally pay overtime for "employment in excess of [forty hours] at a rate not less than one and one-half times the regular rate at which [the individual] is employed." 29 U.S.C. § 207(a)(2). However, the FLSA exempts employees from the overtime pay requirement if the employee is *inter alia* "employed in a bona fide executive, administrative, or professional capacity[.]" 29 U.S.C. § 213(a)(1). GM maintains that, as a DRE, Plaintiff was employed in "administrative" and "professional" capacities.

The Supreme Court once advised that the FLSA's "exemptions are to be narrowly construed against the employers seeking to assert them[.]" *Arnold v. Ben Kanowski, Inc.*, 361 U.S. 388, 392 (1960); *Douglas v. Argo-Tech Corp.*, 113 F.3d

67, 70 (6th Cir. 1997). More recently, however, the Court rejected that construction and advised that the exemptions should be given a "fair (rather than a narrow) interpretation." *Encino Motorcars, LLC v. Navarro*, -- U.S. --, 138 S. Ct. 1134, 1142 (2018) (internal quotation marks and citation omitted); *Sec. of Labor v. Timberline South, LLC*, 925 F.3d 838, 850 (6th Cir. 2019) (quoting *Encino Motorcars*, 138 S. Ct. at 1142). "The employer bears the burden of proving that [an] exemption applies to the employee in question." *Douglas*, 113 F.3d at 70 (citing *Mich. Ass'n of Governmental Employees v. Mich. Dep't of Corr.*, 992 F.2d 82, 83 (6th Cir. 1993)).

An employee qualifies as a professional under the FLSA if he or she earns a weekly salary of at least $684 and has, as his or her "primary duty," the performance of work "[r]equiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction[.]"[1] 29 C.F.R. § 541.300(a). Plaintiff concedes that the salary requirement is met. (Pl. Resp. Br. at 7, ECF No. 29 at Pg ID 977.) The regulations identify three elements required to satisfy the primary duty requirement:

---

[1] Although not applicable here, to qualify, the work alternatively may "[r]equir[e] invention, imagination, originality or talent in a recognized field of artistic or creative endeavor." 29 C.F.R. § 541.300(a)(2)(ii).

11

> (1) The employee must perform work requiring advanced knowledge;
>
> (2) The advanced knowledge must be in a field of science or learning; and
>
> (3) The advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction.

*Id*. § 541.301(a).

There can be no dispute that the second and third elements are satisfied if Plaintiff's work required engineering knowledge, as GM submits. The regulations provide that "field of science or learning" includes, among others, the "traditional profession[] . . . of *engineering*[.]" *Id*. § 541.301(c) (emphasis added). The regulations further provide that "[t]he phrase 'customarily acquired by a prolonged course of specialized intellectual instruction' restricts the exemption to professions where specialized academic training is a standard prerequisite for entrance into the profession." *Id*. § 541.301(b). According to the regulations, "[t]he best prima facie evidence that an employee meets this requirement is possession of the appropriate academic degree." The undisputed evidence reflects that an engineering degree is required for the DRE position and that Plaintiff held such a degree.

As to the first element, the regulations state that "work requiring advanced knowledge" refers to "work which is predominantly intellectual in character, and

12

which includes work requiring the consistent exercise of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or physical work." *Id.* § 541.301(b). The undisputed evidence shows that, in the DRE role, Plaintiff's primary duties were intellectual in character and required her to exercise discretion and judgment. She did not perform routine mental, manual, mechanical, or physical work.

Despite Plaintiff's attempt to create issues of fact with respect to the advanced knowledge required to perform the DRE role by filing a declaration in response to GM's motion, the remaining evidence—including Plaintiff's contradictory deposition testimony—reflects that the primary duties of the job required such knowledge. "[A] party may not create a disputed issue of material fact by filing an affidavit that contradicts that party's earlier deposition testimony." *Aerel, SRL v. PCC Airfoils, LLC*, 448 F.3d 899, 906 (6th Cir. 2006) (citing *Penny v. UPS*, 128 F.3d 408, 415 (6th Cir. 1997); *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986)).

Plaintiff's primary duty was to resolve issues arising with the door wiring harnesses assigned to her. She testified that she "was expected to learn how to engineer the wiring harness *independently without any direction from management*

*or mentors.*"[2]  Murray's testimony and the goals and objectives listed on Plaintiff's mid-year and year-end CAP performance reviews reflect that her primary duty was to provide high-quality engineering work focused on problem-solving.  Plaintiff expressly testified that the listed goals and objectives accurately reflected her job responsibilities.

In her declaration, Plaintiff provides four examples of the problems she tackled to undermine the advanced knowledge required to perform her job.  However, the fact that the *solution* to two of the issues assigned to Plaintiff may not have required her to utilize her engineering degree or knowledge does not mean that she did not use that degree or knowledge to analyze the problem, eliminate other causes, or pinpoint the cause.  Further, the evidence suggests that Plaintiff was expected to do more than fix the problem but to also identify the "root cause" of the issue.[3]  (*See* 3/1/19 email, ECF No. 72-12 at Pg ID 546 (Murray asking in response to Plaintiff's email identifying how she resolved two issues:

---

[2] Plaintiff's testimony that she worked independently without direction is not undermined by her later declaration that all of her work orders had to be approved by her Lead and Murray.  (*See* Pl. Decl. ¶ 14, ECF No. 29-1 at Pg Id 1001.)  The regulations state that "employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level."  29 C.F.R. § 541.202(c).

[3] For example, Plaintiff may have traced the problem with the window control switch to a broken ground wire and pinched door harness, but what caused the wire to break and the door to become pinched?

14

"What are the root causes and next steps based upon your analysis? Is this a design, VAP manufacturing, or supplier issue?").) It is the expectations of an employee's job duties rather than whether the employee successfully performed those duties that instructs whether an exemption applies. *See Reyes v. Goya Foods, Inc.*, 549 F. App'x 876, 878 (11th Cir. Dec. 6, 2013) (holding that an employer's expectations regarding an employee's job duties can render the employee exempt, even if the employee did not perform the duties); *White v. Winn-Dixie Montgomery, LLC*, No. 2:14-cv-01702, 2017 WL 529298, at *13 (N.D. Ala. Feb. 9, 2017) ("Plaintiff's failure to properly perform his job duties simply does not remove him from the executive exemption."); *Aschenbrenner v. Dolgencorp, Inc.*, No. 8:10cv00153, 2011 WL 2200630, at *14 (D. Neb. June 3, 2011) (explaining that an employee's exempt status is not dependent upon the choices the employee makes to disregard the duties set forth in the applicable job description, performance review criteria, and bonus plan, as "[u]nder such a rule, a manager theoretically could choose to perform nonmanagerial tasks rather than managerial tasks and be eligible for overtime pay under the FLSA").

Plaintiff's attempt through her declaration to portray her duties as involving uncomplicated issues, not requiring advanced knowledge, is further contradicted by her testimony that wiring harnesses are "known inside and outside the industry as the most complicated product that one could work on" and her claim that they

15

are "the most dynamic and complicated commodity within General Motors." (Pl. Dep. at 104-05, 186, ECF No. 27-4 at Pg ID 306-07, 388.) Moreover, the DRE role undisputedly required an engineering degree. More importantly, Plaintiff testified that she was qualified for the position *because of* that degree and her "over 15 years of *engineering* experience." (Pl. Dep. at 106, ECF No. 27-4 at Pg ID 308.)

In her declaration, Plaintiff points out that her degree is in mechanical engineering, rather than electrical engineering. (Pl. Decl. ¶ 4, ECF No. 29-1 at Pg ID 998.) However, Plaintiff admits that she did take some electrical engineering classes. (*Id*.) Plaintiff asserts that electrical engineering work and mechanical engineering work are different. (*Id*.) This does not mean, however, that Plaintiff's engineering degree—regardless of which specific area it was in—failed to provide the advanced knowledge required to perform the DRE role. In other words, Plaintiff undoubtedly held an engineering degree, which is a degree "acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.301(a). As indicated, an engineering degree is required for the position and Plaintiff testified that she was qualified for the role at least in part *because of* her degree and *engineering* experience. GM hired Plaintiff aware that she held a mechanical rather than an electrical engineering degree.

For these reasons, even drawing all inferences from the evidence in the light most favorable to Plaintiff, the Court finds no genuine issue as to whether she was an exempt professional under the FLSA. For this reason, the Court finds it unnecessary to address GM's alternative argument that Plaintiff also is exempt under the administrative exemption.

## IV. Conclusion

In short, the Court holds that Plaintiff was exempt from the FLSA's overtime requirements under the professional exemption.

Accordingly,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (ECF No. 27) is **GRANTED**.

s/ Linda V. Parker<br>
LINDA V. PARKER<br>
U.S. DISTRICT JUDGE

Dated: January 11, 2023